UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
* * * * * * * * * * * * * * *

STEPHEN BOLICK, as Personal
Representative of the Estate of Matthew     Case No.: 1:11-cv-01101-PLM
Bolick, deceased; KEVIN BOLICK; and
JONATHAN BOLICK,                            HON. PAUL L. MALONEY
                                            MAGISTRATE ELLEN S. CARMODY
      Plaintiffs,

vs.

CITY OF EAST GRAND RAPIDS, a
municipal Corporation; SGT. BRIAN DAVIS;
OFFICER GARY PARKER; and MARK
HERALD, Director East Grand Rapids
Department of Public Safety,

      Defendants.

---

| WILLIAM F. MILLS (P24263) | JOHN J. GILLOOLY (P41948) |
|---|---|
| BENJAMIN W. MILLS (P66155) | Attorney for Defendants |
| Attorneys for Plaintiffs | Garan Lucow Miller, P.C. |
| Gruel Mills Nims & Pylman LLP | 1000 Woodbridge Street |
| 50 Monroe Avenue NW, Suite 700W | Detroit, MI 48207-3192 |
| Grand Rapids, MI 49503 | (313)446-5501 |
| (616) 235-5500 | |

---

# PLAINTIFFS' BRIEF IN RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**INTRODUCTION**

On December 7, 2012, both plaintiff and defendants filed respective motions for Summary Judgment. This brief is filed in response to Defendants' Motion for Summary Judgment. In response to Defendants' Motion, Plaintiff relies not only on the brief herein, but also on Plaintiff's brief filed on December 7, 2012.

**FACTS**

The relevant facts for this matter have been addressed and described in Plaintiff's Brief in Support of its Motion for Summary Judgment, filed on December 7, 2012. In summary, these undisputed facts demonstrate:

- Matthew Bolick was suffering from a severe, acute mental breakdown on November 16, 2009. His symptoms were consistent with what has been described in medical and police literature as "excited delirium."

- Matthew Bolick's father called 911 and informed the dispatcher that Matthew had "completely freaked out" and had broken a picture window at their home.

- Matthew Bolick's father informed Sergeant Davis that Matthew was "delusional" and was "hearing voices" and had "lost it."

- Neither Parker nor Davis had been trained in recognizing or responding to "excited delirium."

- The Taser training manual indicated that when dealing with individuals exhibiting signs of "excited delirium," physical struggle should be kept to a minimum due to a "significant risk of arrest-related death."

- Parker and Davis engaged in a prolonged physical struggle with Matthew Bolick after he had retreated into his own home and was no longer a threat. This struggle lasted approximately ten minutes.

- Davis and Parker handcuffed Matthew Bolick in a prone position and Davis used his body weight to press Matthew's torso into the floor while he was handcuffed.

- After Matthew was handcuffed, Parker deployed his Taser on Matthew at least one time.

1

- Davis remained on top of Matthew's torso until he was relieved by a Grand Rapids police officer, who did not relieve Davis until after EMS was on scene. Sheridan, tr. p 25. *See* [Doc #68-1; ID#700].

- EMS records show that EMS arrived on scene at 9:35 p.m. and were attending to Matthew Bolick at 9:36 p.m, where it was noted that Matthew was not breathing, had no pulse, and was in cardiac arrest. **Exhibit 1**.

## LAW AND ARGUMENT

Under the Federal Rules of Civil Procedure, a motion for summary judgment brought pursuant to Rule 56 is only appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c).

A motion for summary judgment fails where the non-movant "set[s] forth… specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 256, citing *Adickes v. Kress & Co.*, 398 U.S. 144, 158-59 (1970). Accordingly, a reviewing court must liberally construe all pleadings, facts and inferences in favor of the nonmoving party when determining the presence or non-presence of a genuine issue for trial. See *Adickes*, 398 U.S. at 159.

As demonstrated in plaintiff's Motion for Summary Judgment and Brief in Support, previously filed, Plaintiff believes he is entitled to Summary Judgment on the issues of qualified immunity and excessive force. However, even if Plaintiff's motion were to be denied, there are enough genuine issues of material fact to warrant a denial of Defendants' Motion.

**I.    Defendants' Taser Arguments Fail, Because Matthew Bolick had Retreated to his own Home, was Not a Threat to Himself or Others, and was Clearly Mentally Disturbed**

2

Defendant has argued that the use of the Taser against Matthew Bolick was warranted under the circumstances, because Matthew Bolick was actively resisting arrest and refusing to be handcuffed, relying on *Hagans v Franklin County Sheriff's Office*, 695 F.3d 505 (6th Cir. 2012). The *Hagans* Court concluded that the constitutional right for an individual who was actively resisting arrest and refusing to be handcuffed to be free from repeated taser firings was not clearly established *in May of 2007*. In *Hagans*, the suspect was not in handcuffs when he was repeatedly tasered. This is in stark contrast to the instant case, where taser shocks were administered while Matthew Bolick was already restrained in handcuffs and face down on the floor with two officers on top of him.

The fact pattern in the instant case is much more similar to *Landis v Baker*, 297 Fed. Appx. 453 (6th Cir. 2008). In that case, Charles Keiser was suffering from an obvious mental condition when he blocked southbound lanes of US-23 with a bulldozer. When approached by police, he "muttered something about God" and ran from the officers. When he was tackled to the ground, he began choking an officer with his hands, escaped and ran into the nearby woods. *Id* at 455-456. Keiser was described as being "on something" and that "nothing can stop him at this point." *Id* at 456. The officers followed Keiser into the woods until he stopped in a swampy area. He was unarmed, had a blank stare, and was unresponsive to the officers. *Id*. He failed to obey commands to take his hands out of his pockets. At that point, a struggle ensued, which began with an unsuccessful taser firing that failed to incapacitate Keiser. He was then brought down by three officers, who attempted to handcuff him. *Id* at 457. Keiser resisted being handcuffed during the entire struggle. *Id* at 457-458. One officer was on top of him attempting to secure his arms in handcuffs. At some point, the officers noticed that Keiser's face was underwater, Keiser was handcuffed, and he was dragged onto dry land, where he was unresponsive. Keiser died as a result of drowning.

The *Landis* Court, in its opinion dated October 16, 2008 (more than one year prior to Matthew Bolick's death), made several significant findings in affirming the District Court's denial of the Defendants' Motion for Summary Judgment. The Court, relying on *Champion v Outlook Nashville, Inc.*, 380 F.3d 893 (6th Cir. 2004), concluded that a jury could reasonably conclude that it was objectively unreasonable to hold Keiser in a face down prone position in two feet of mud and water and apply a stun gun to Keiser while he was in this position and at least one hand was handcuffed. The Court noted that the Sixth Circuit has concluded that "[c]reating asphyxiating conditions by putting substantial or significant pressure, such as body weight, on the back of an incapacitated and bound suspects constitutes unreasonable excessive force," citing *Pirolozzi v Stanbro*, No. 07-CV-798, 2008 WL 1977504, 7, 2008 US Dist. LEXIS 36054, 19 (N.D. Ohio May 1, 2008) (quoting *Champion*, 380 F.3d at 903).

The *Landis* Court also held that the fact that Keiser was suffering from a mental condition should have factored in to the use of force. The Court stated:

> A determination of the reasonableness of the defendant officers' conduct must take into account the fact that at the time of the fatal struggle, the defendant officers had reason to believe that Keiser was either on drugs or mentally unstable and they knew that he was unarmed. *Deorle v. Rutherford,* 272 F.3d 1272, 1282– 83 (9th Cir.2001) (the mental illness of a suspect is also a factor to be considered in determining the reasonableness of the force employed). Thus, the Defendant officers should have approached the situation with Keiser bearing this fact in mind. *Id.* (different tactics should be employed against an unarmed, emotionally distraught individual who is resisting arrest or creating disturbance than would be used against an armed and dangerous criminal who has recently committed a serious offense); *Marsall v. City of Portland,* No. CV– 01– 1014– ST, 2004 WL 1048127, *11, 2004 U.S. Dist. LEXIS 8764, *33 (D.Or. May 7, 2004) (" when police are confronted by an unarmed, emotionally distraught individual who has committed no serious crime, as opposed to an armed and dangerous criminal, the governmental interest in using force is diminished, not strengthened, even when the suspect is irrational and inviting the use of force" ).

Here, Davis and Parker confronted Matthew on the street and followed him into his home. Davis radioed dispatch to inform them that they were "taking one into custody." Davis tr, p 85 [Doc#73-1; ID#1630]. Both knew that Matthew was mentally unstable. Davis tr, pp 46-47 [Doc#73-1; ID#1619-1621]; Parker tr, p 81 [Doc#77-1; ID#1674]. Once Matthew was in his home, he went to the kitchen and turned on the sink. Davis tr, p 87 [Doc#73-1; ID#1630]. At that point, Parker and Davis physically engaged Matthew, with Parker applying drive stuns from his Taser. Their justification for this is that there were kitchen knives nearby that posed a threat, notwithstanding the fact that Matthew never touched, reached for, or threatened to reach for a knife. Davis tr, p 89 [Doc#73-1; ID#1631]; Parker tr, p 113 [Doc#77-1; ID#1682]. Parker and Davis forced Matthew to the ground, applied handcuffs, and Davis placed significant body weight on his torso for approximately ten minutes, interfering with Matthew's ability to breathe. Parker tr. p 126 [Doc#77-1; ID#1685]. Parker applied the taser to Matthew again after handcuffs were applied. Parker tr. 123 [Doc#77; ID#1684]. Soon after Davis was relieved by GRPD officer Sheridan, Matthew became unresponsive and died.

Both of these unjustifiable actions (applying significant pressure to the back of a handcuffed individual in a prone position and applying a taser after an individual has been handcuffed) had been held to be unreasonable excessive force in the Sixth Circuit well prior to November 16, 2009. *Champion v Outlook Nashville, Inc.*, 380 F.3d 893 (6th Cir. 2004); *Landis v Baker*, 297 Fed. Appx. 453 (6th Cir. 2008). At a bare minimum, there are genuine issues of material fact that must prevent this Court from granting Defendants' Motion.

**II.    Plaintiff's Claims Against East Grand Rapids Must Survive, as its Failure to Train its Officers in Dealing with Mentally Disturbed Persons Exhibiting Agitated Behavior Amounts to Deliberate Indifference to a Recognized Need.**

If a constitutional violation has occurred, a municipality can be held liable for its failure to train its officers. Even if there was a constitutional violation of Matt's rights but those rights were not clearly established, liability against the municipality survives. *Gray v. City of Detroit,* 399 F.3d 612, n. 18 (6th Cir. 2005).

"The inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). Upon a showing of inadequate training, the question becomes whether that inadequate training can be said to represent "city policy," which is only satisfied by deliberate indifference. *Id.* at 389. **If, "in light of the duties assigned to specific officers or employees, the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights," then "the policy makers of the city can reasonably be said to have been indifferent to the need."** *Id.* at 390. It is not enough that a sound program was negligently administered, an injury could have been avoided if the officer had more or better training, or that an individual officer made a mistake. *Id.* at 391.

Sergeant Davis testified that he has had numerous confrontations with individuals exhibiting signs of mental illness during his duties as an East Grand Rapids Public Safety Officer. Davis tr. p 14. He testified that it could be foreseeable that a person with mental illness could become confrontational. *Id* at 16. Similarly, officer Parker has had the occasion to respond to an individual with mental illness, and indicated it was foreseeable that a person with mental illness could become aggressive. Parker tr. pp 35-38. Captain Charles Lark, who coordinates the training of all East Grand Rapids Public Safety officers, Lark tr. p 8 [Doc#69-2; ID#865], testified that dealing with mentally ill persons is a usual and recurring issue. *Id* at 48-49. However, he admitted that no training had been provided on the topic of excited delirium.

*Id* at 49. In fact, he testified that he was not aware of an increased risk of death if a taser was used on a person suffering from excited delirium. *Id* at 45. This is despite specific warnings from Taser International regarding the use of a taser on a person exhibiting symptoms of excited delirium. *See,* [Doc#70-2; ID#1318] ("When encountering subjects exhibiting symptoms of exhaustion, distress, or agitated/excited delirium, refer to your agency's guidelines for proper response. These subjects are at significant risk of arrest related death. Immediate medical attention may reduce this risk.")

Neither Davis nor Parker were trained in spotting the signs and symptoms of excited delirium prior to November 16, 2009. Parker tr, pp 63-64; Davis tr, p 107. As a topic of discussion among police agencies nationwide, Excited Delirium, and the particular problems it may present, has been discussed for years, as discussed in Plaintiff's Brief in Support of his Motion for Summary Judgment. Taser International itself published updated warnings regarding excited delirium just weeks before Matthew's death. Sergeant Timothy Schweitzer was the department's instructor in the use of Tasers. Although Sergeant Schweitzer disseminated some information to his officers regarding an update of the preferred target area for Tasers (avoiding the chest), he testified that he did not disseminate the information regarding excited delirium. Schweitzer tr, p 24 ("A: I don't recall reviewing this document [exhibit 4 to Schweitzer's deposition]. I believe I stated that prior. Q: Okay. Well, if you don't recall that, do you recall teaching them about the document if you didn't see it? A: No.") *Id*. *See,* [Doc#70-2; ID#1316-1318] discusses the "significant risk of arrest-related death" posed by individuals exhibiting symptoms of excited delirium, and directs Taser operators to "refer to your agency's guidelines for proper response." Prior to November 16, 2009, East Grand Rapids had no guidelines for dealing with excited delirium. This is at least *four years* after excited delirium became a significant topic of discussion in the law enforcement community.

Moreover, Davis testified that he was not trained to avoid prolonged prone restraint when making an arrest because of potential for asphyxiation.  Davis tr, p 114 ("Q:  Were you ever trained that a person could be flat on the ground in a prone position, on their stomach, and suffer from loss of oxygen because they're being held down? A:  No.")  Contrary to East Grand Rapids, other police forces have been adequately trained in the topic of positional asphyxiation.  *See Weigel v. Broad,* 544 F.3d 1143, 1154-55 (10th Cir. 2008) (explaining one department's training on positional asphyxiation and instructions get suspect off his stomach as soon as possible).  This lack of training regarding excited delirium and asphyxiation created a substantially increased risk of death for Matthew Bolick.  See reports of George Kirkham and Melvin Tucker, [Doc#77-4;ID#1735-1739 and Doc#77-3; ID#1721-1733].

The Supreme Court in *City of Canton*, *supra*, said "city policy makers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights."  489 U.S. at 390 n. 10.   The same is true here.  The City of East Grand Rapids armed their officers with Tasers, knowing that Tasers are intended to be used to subdue agitated individuals.  Despite being warned by Taser International that individuals with excited delirium should be handled differently because of the significantly increased risk of arrest-related death, East Grand Rapids failed to train its officers in either excited delirium or positional asphyxiation.  The need for this type of training is "so obvious" that failure to do so amounts to a "deliberate indifference" to the constitutional rights of emotionally or mentally agitated individuals who come in contact with offices of the East Grand Rapids Department of Public Safety.

8

Where there is an identifiable deficiency in a city's training program, the deficiency must be closely related to the ultimate injury. The question is whether the injury would have been avoided had the employee been trained under a program that was not deficient in that way. *City of Canton*, *supra*, 489 U.S. at 391.  If Davis and Parker had adequate training in how to use Tasers or how to approach mentally ill people, they would have used a different method to apprehend Matthew With adequate training, they would not have added fuel to the excited delirium, placed pressure on Matthew's back and caused asphyxiation, or repeatedly shot Tasers at him when they realized it was not working.

### III. Plaintiff's Pendant State Law Claims of Assault and Battery Survive, Because Assault and Battery by a Police Officer was a Recognized Exception to Governmental Immunity Prior to *Ross v Consumers Power*, 420 Mich 567 (1984).

Defendants argue that the Michigan Supreme Court case of *Odom v Wayne County*, 482 Mich 459 (2008) establishes that governmental immunity questions for lower level public employees are resolved by the test enunciated in *Ross v Consumers Power*, 420 Mich 567 (1984).  This is simply not the case for allegations of assault and battery by a police officer, an intentional tort.  In *Odom, supra*, the Michigan Supreme Court stated: "We correct today this tangle of cases arising after the enactment of the current GTLA by following the legislative direction to apply the common law "as it existed before July 7, 1986" with respect to governmental immunity.  *Odom v Wayne Co*, 482 Mich 459, 472-73; 760 NW2d 217, 224 (2008).  Defendants assume that there was no common law exception to governmental immunity for the intentional tort of assault and battery prior to July 7, 1986.  This is wrong.

As stated in the concurring opinion in *Sudul v City of Hamtramck*, 221 Mich App 455, 481-82; 562 NW2d 478, 488-89 (1997):

> The intentional torts of assault and battery-and excessive force-by
> individual police officers were recognized exceptions to governmental

9

> immunity in Michigan both before the enactment of § 7 of the governmental immunity statute on July 1, 1965, and the effective date of subsection 2 of § 7, being July 7, 1986. See *Lockaby v. Wayne Co.,* 406 Mich. 65, 276 N.W.2d 1 (1979); *Sherbutte v. Marine City,* 374 Mich. 48, 130 N.W.2d 920 (1964); *Blackman v. Cooper,* 89 Mich.App. 639, 643, 280 N.W.2d 620 (1979) (claim that police officer assaulted, battered, and used excessive force upon plaintiff enjoyed no common-law immunity from tort liability); *Burns v. Malak,* 897 F.Supp. 985 (E.D.Mich.,1995); *Roxbury v. Paul,* 838 F.Supp. 1204, 1209 (W.D.Mich.,1992), aff'd, 7 F.3d 234 (CA6, 1993) ("[p]olice officers had no common law immunity for assaulting, battering, and using excessive force"); *Smith v. Yono,* 613 F.Supp. 50, 54 (E.D.Mich., 1985) ("[b]ased upon the guidelines established in *Ross* [*v Consumers Power Co (On Rehearing),* 420 Mich 567; 363 NW2d 641 (1984)], individual police officers employing excessive force in an arrest are not immune from tort liability"). See also discussions in *Smith v. Dep't of Public Health,* 428 Mich. 540, 608-609, 410 N.W.2d 749 (1987), aff'd sub nom, *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), and *Ross, supra* at 660, 363 N.W.2d 641.

*Sudul v City of Hamtramck*, 221 Mich App 455, 481-82; 562 NW2d 478, 488-89 (1997) (concurring opinion of Judge Murphy)

Judge Murphy, in his concurring opinion in *Sudul*, provided a lengthy analysis of whether governmental immunity was available to police officers who were alleged to have committed assault and battery or excessive force. *Id* at 481-488. Judge Murphy noted that *Ross* specifically recognized the fact that no individual immunity for police officers exists for tortuous performance of a duty – specifically excessive force in effecting an arrest. *Ross, supra*, at 660, n. 51, 363 NW2d 641. Therefore, plaintiff's state law claims must survive, and Summary Judgment must be denied.

## CONCLUSION

For the reasons stated herein, Plaintiff respectfully requests that this Court deny Defendants' Motion for Summary Disposition.

Dated: January 4, 2013                       GRUEL MILLS NIMS & PYLMAN LLP

                                                 By: */s/William F. Mills*
                                                      William F. Mills (P24263)
                                                      Attorneys for Plaintiffs
                                                      Gruel Mills Nims & Pylman LLP
                                                      50 Monroe Avenue NW, Suite 700W
                                                      Grand Rapids, MI 49503
                                                      (616) 235-5500